## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| KELLY HARRIS, individually and on behalf of all others similarly situated, | ) ) ) Case No. |
| Plaintiff, | ) ) |
| v. | ) **CLASS ACTION COMPLAINT** ) |
| PENSION BENEFIT INFORMATION, LLC d/b/a PBI RESEARCH SERVICES and PROGRESS SOFTWARE CORPORATION, | ) **JURY TRIAL DEMANDED** ) ) ) ) |
| Defendants. | ) ) |

Plaintiff Kelly Harris ("Plaintiff"), by her undersigned counsel, files this Class Action Complaint, individually and on behalf of a class of all similarly situated persons, against Defendants Pension Benefit Information, LLC d/b/a PBI Research Services ("PBI") and Progress Software Corporation ("PSC") (collectively, "Defendants"). Plaintiff bases the following allegations upon personal knowledge as to her own acts and otherwise on information and belief and the investigation of counsel, and states the following:

## INTRODUCTION

1. Plaintiff brings this class action on behalf of herself and all other individuals ("Class Members") whose sensitive personal information was disclosed to unauthorized third parties during a massive data breach that exploited a vulnerability in software technology called MOVEit on or about May 27, 2023 (the "Data Breach").

2.      Sensitive personal information ("SPI") that was compromised in the Data Breach includes Class Members' full name; driver's license and/or identification card number; physical address; date of birth; Social Security number; insurance policy number; height; eye color; vehicle registration information; handicap placard information; and names of former or current employers, spouses or domestic partners, and children.[1]

3.      As Defendants are or should have been aware, this type of personal and sensitive data is highly targeted by hackers who seek to exploit that data for nefarious purposes. For example, fraudsters attempt to utilize financial information to make fraudulent transactions and purchases, or use a collection of personal data to take out fraudulent loans. In the wrong hands, these types of sensitive data may be wielded to cause significant harm to the Class Members.

4.      Defendant PBI is a company that provides services to pension funds and insurers, such as the California Public Employees' Retirement System ("CalPERS"). PBI's services include locating individuals for those funds and insurers and satisfying regulatory obligations to search databases to identify deaths of insured persons and fund members in order to determine benefit eligibility. As part of its business operations, PBI uses a managed file transfer software called MOVEit.

5.      MOVEit software is likewise used by a large number of commercial entities and federal and state agencies to transfer large data files.

---

[1] *See* https://www.oregon.gov/odot/dmv/pages/data_breach.aspx (last accessed July 10, 2023); https://www.expresslane.org/alerts/; https://www.calpers.ca.gov/page/home/pbi (last accessed July 10, 2023); https://www.genworth.com/moveit.html (last accessed July 10, 2023).

6.    Defendant PSC is a technology company that acquired the developer of MOVEit in May 2019 for $225 million in order to "bolster [PSC]'s core offerings." Since that time, PSC's core offerings have included selling and/or licensing MOVEit to its enterprise customers.[2]

7.    Since the Data Breach on May 27, 2023, a multitude of commercial and governmental entities have announced that their data, and therefore the data of millions of their customers, clients, and/or members, has been impacted.  The large number of companies that have announced being impacted by the breach underscores the widespread effect and deep consequences of this Data Breach.  The full scope of the Data Breach, however, is not yet known, as entities continue to disclose breaches of their data.

8.    The United States Cybersecurity & Infrastructure Security Agency has identified the data exfiltrators as "CL0P Ransomware Gang," also known as TA505, and reports that the attacks were conducted by exploiting a vulnerability catalogued as "CVE-2023-34362" in order to exfiltrate data from the underlying MOVEit databases.[3]  CISA reports that TA505 has been known both to publish exfiltrated data and to ransom exfiltrated data for profit.

9.    Defendants tout that they are technology professionals capable of and committed to safeguarding their clients' data and the individuals' information contained in that data.

---

[2] https://www.sec.gov/Archives/edgar/data/876167/000087616719000073/ipswitchclose_finalxpressx.htm (last accessed July 10, 2023).
[3] https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-158a (last accessed July 10, 2023).

10.    In reality, Defendants' pronouncements as being capable data custodians proved false.  Contrary to their many representations and promises, Defendants utilized inadequate data security measures they knew, or should have known, put the highly sensitive data they oversaw at significant risk of theft by or exposure to nefarious parties.

11.    Plaintiff Kelly Harris is a victim of the Data Breach.  She is a resident of California and a member of CalPERS whose SPI was compromised by the breach of CalPERS data.

12.    Plaintiff and the Class Members remain at a continued risk of harm due to the exposure and potential misuse of their sensitive personal information by criminal hackers.

13.    As such, Plaintiff brings this Complaint on behalf of persons whose SPI was stolen during the Data Breach.  Plaintiff asserts claims for negligence, negligence per se, and for declaratory and injunctive relief.

## JURISDICTION

14.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, which affords federal courts with original jurisdiction over cases where any member of the plaintiff class is a citizen of a state different from any defendant, and where the amount in controversy exceeds $5,000,000, exclusive of interest and costs.  Here, Plaintiff is diverse from Defendants because Plaintiff resides in California, while Defendant PBI resides in Minnesota and Delaware, where it is headquartered and incorporated, respectively, and Defendant PSC resides in Massachusetts and Delaware, where it is headquartered and incorporated, respectively.  Plaintiff alleges

that, in the aggregate, the claims of all purported class members exceed $5,000,000, exclusive of interest and costs.

15.    This Court has general personal jurisdiction over Defendant PBI because PBI is headquartered in Minneapolis, Minnesota and is registered to conduct business in Minnesota and has a registered office address in Roseville, Minnesota.  This Court has general personal jurisdiction over Defendant PSC because PSC is registered to conduct business in Minnesota and has a registered office address in Roseville, Minnesota. Defendants have minimum contacts with Minnesota because they conduct substantial business in the state.

16.    This Court is the proper venue for this case pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in Minnesota and because Defendants conduct a substantial part of their business within this District.

## PARTIES

17.    **Plaintiff** Kelly Harris is a resident of California and a member of CalPERS. Harris received notice via mail that her personal information was stolen during the Data Breach.  After the Data Breach, Harris experienced effects of her information being compromised and used nefariously, including receiving numerous suspicious notifications from two of her email accounts.

18.    **Defendant** Pension Benefit Information, LLC d/b/a PBI Research Services is a for-profit Delaware corporation with its principal place of business at 333 S 7th Street, Suite 2400, Minneapolis, MN 55402.

19.     **Defendant** Progress Software Corporation is a for-profit Delaware corporation with its principal place of business at 15 Wayside Road, Suite 400, Burlington, MA 01803.

## FACTS

**A.     Defendants Provide Technology Services Involving Highly Sensitive Data**

20.     Defendant PBI is a company located in Minneapolis, Minnesota that provides services to entities across the nation, including identification of decedents, plan participants, and policyholders.

21.     To provide these services, PBI handles the sensitive personal information of millions of individuals, including social security numbers, names, dates of birth, zip codes, states, policy numbers, and names of individuals' employers, spouses or partners, and children.

22.     PBI acknowledges how critical it is to safeguard this information—and, therefore, how devastating it is to individuals whose information has been stolen. PBI proclaims that "[p]rotecting and securing the information of our clients … is of critical importance to PBI";[4] that PBI "is committed to the responsible use of information and protection of individual privacy rights"; that PBI "strives to provide products and services … that help reduce and prevent fraud … in ways that protect individuals' privacy"; that PBI "aspire[s] to protect individuals' privacy through the design of our products and services"; that "[d]ata security is a company imperative"; that "PBI strives to provide

---

[4] https://www.pbinfo.com/data-security/ (last accessed July 10, 2023).

additional safeguards for sensitive personally identifiable information"; that "PBI believes in the important of notifying individuals who may have had their sensitive personally identifiable information acquired by an unauthorized individual";[5] and that "PBI recognizes the importance of protecting personal information."[6]

23.    PBI utilizes MOVEit software and on-premises hardware to conduct its business operations.[7] By using on-premises MOVEit hardware, PBI had physical control over the server that was breached at the time of the breach.

24.    Defendant PSC also provides services to entities across the nation. PSC licenses its MOVEit software and associated hardware to enable companies, including PBI, to transfer large volumes of information—and, purportedly, to do so securely. The information handled by MOVEit software and hardware is often highly sensitive, including SPI such as an individual's full name; driver's license and/or identification card number; physical address; date of birth; Social Security number; insurance policy number; height; eye color; vehicle registration information; handicap placard information; and names of former or current employers, spouses or domestic partners, and children.

25.    Like PBI, PSC acknowledges the critical nature of safeguarding such SPI. PSC boasts that MOVEit can "easily ensure the reliability of core business processes, and secure the transfer for sensitive data"; "provides full security, reliability and compliance";

---

[5] https://www.pbinfo.com/privacy-principles/ (last accessed July 10, 2023).
[6] https://www.pbinfo.com/privacy-policy/ (last accessed July 10, 2023).
[7] *See* https://www.pbinfo.com/faq-communication/ (last accessed July 10, 2023) ("PBI systems were not impacted, outside of the isolated MOVEit Transfer server"); https://www.ipswitch.com/moveit (last accessed July 10, 2023) ("MOVEit Transfer provides ... an on-premises solution.").

provides "security, centralized access controls, file encryption and activity tracking needed to ensure operational reliability and compliance"; permits users to "[r]eliabl[y] and easily comply with SLAs, internal governance requirements and regulations"; "reduces errors while mitigating the risk of data loss";[8] and can "transfer sensitive information securely" and "assure regulatory compliance."[9]   These features, according to PSC, will "keep sensitive information out of harm's way."[10]

26.    PSC has further held itself out as a data security expert by publishing and advertising a "whitepaper" on its website titled "Ransomware vulnerabilities in file transfer," which purports to teach "how to assure your file transfer servers aren't the launching pad for a ransomware attack."[11]

27.    Despite Defendants' promises to protect sensitive data and efforts to portray themselves as capable data custodians, Defendants' own data security decisions created substantial gaps that Defendants knew or should have known created a risk of a data breach. That risk materialized in May 2023, when hackers broke into Defendants' systems and stole highly sensitive data at will and put Plaintiff and the Class at risk that their data would be misused and cause them harm.

---

[8] https://www.ipswitch.com/moveit (last accessed July 10, 2023).
[9] https://www.progress.com/moveit (last accessed July 10, 2023).
[10] *Id.*
[11] https://www.ipswitch.com/resources/whitepapers-ebooks/ransomware-vulnerabilities-in-file-transfer (last accessed July 10, 2023).

**B.      Defendants Exposed Highly Sensitive Data to Hackers**

28.      Beginning on May 27, 2023, hackers exploited a vulnerability in the MOVEit technology and accessed, copied, and stole the Class Members' highly sensitive data. Inexplicably, and inexcusably, Plaintiff was not informed that her data was breached until several weeks later.

29.      According to the United States Cybersecurity & Infrastructure Security Agency, the attack began on May 27, 2023.[12]  PSC was aware of the vulnerability in its MOVEit technology by no later than May 31, 2023, and published a software update purportedly addressing the vulnerability.[13]

30.      According to PBI's website, "PBI became aware of the MOVEit compromise on June 2, 2023," and only then applied the software patch provided by PSC.[14]  This means that PBI delayed at least two days before applying the patch to address the vulnerability in its systems that was allowing unauthorized access to Class Members' SPI to third parties.

31.      Further delay ensued before any Class Members were informed of the Data Breach. While PBI initially communicated the breach to CalPERS on June 6, 2023, that communication by PBI was so deficient as to detail and scope that it did not give CalPERS sufficient information to notify its members of the breach until further information was gathered.[15] As a result of Defendants' needless delay, Plaintiff and Class Members did not

---

[12] https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-158a (last accessed July 10, 2023).
[13] https://www.progress.com/security/moveit-transfer-and-moveit-cloud-vulnerability (last accessed July 10, 2023).
[14] https://www.pbinfo.com/faq-communication/ (last accessed July 10, 2023).
[15] https://www.calpers.ca.gov/page/home/pbi (last accessed July 10, 2023).

receive notice of the Data Breach—and therefore could not take remedial steps to protect their credit and accounts from malicious actors—until mid-June, weeks after the Data Breach occurred.

**C.      Defendants' Insufficient Data Security Caused the Data Breach**

32.      Security experts, both private and governmental, have long warned companies that data security must be a top priority.  The FTC, for example, has also issued numerous guidelines for businesses highlighting the importance of reasonable data security practices. The FTC notes the need to factor data security into all business decision-making.[16] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; using industry tested and accepted security methods; (5) monitoring activity on  networks to uncover unapproved activity; (6) verifying that privacy and security features function properly; (7) testing for common vulnerabilities; and (8) updating and patching third-party software.[17]

---

[16] Federal Trade Comm'n, *Start with Security A Guide For Business, Lessons Learned from FTC Cases* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[17] *Id.*; Federal Trade Comm'n, *Protecting Personal Information, A Guide For Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

33.     The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

34.     As such, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ₱ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ₱ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all proceeded Defendants' Data Breach, further clarify the measures businesses must take to meet their data security obligations.

35.     Although Defendants' businesses involve handling highly sensitive data, Defendants implemented inadequate data security practices that they knew or should have known, especially as technology companies and experts, put their clients and their customers at risk of having their sensitive data exposed.

**D.    The Data Breach was a Foreseeable Risk of which Defendants were on Notice**

36.      It is well known that SPI, including Social Security numbers in particular, are valuable commodities and a frequent, intentional target of cyber criminals.  Companies that collect and handle such information, including Defendants, are well aware of the risk of being targeted by cybercriminals.

37.     Individuals place a high value not only on their SPI, but also on the privacy of that data. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

38.     A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim.  An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g.,

postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[18]

39.     Individuals, like Plaintiff and Class members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing your DNA for hacker's purposes.

40.     Data Breach victims suffer long-term consequences when their Social Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiff and Class Members cannot obtain new numbers unless they become a victim of social security number misuse.

41.     The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[19]

42.     In 2021, there were a record 1,862 data breaches, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[20]

---

[18] "Victims of Identity Theft, 2018," U.S. Department of Justice (April 2021, NCJ 256085) available at: https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed March 3, 2023).
[19] https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed March 3, 2023).
[20] https://www.cnet.com/tech/services-and-software/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last accessed March 3, 2023).

43.    Additionally in 2021, there was a 15.1% increase in cyberattacks and data breaches since 2020. Over the next two years, in a poll done on security executives, they have predicted an increase in attacks from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated.  Unfortunately, these preventable causes will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[21]

44.    In light of high-profile data breaches at other companies, Defendants knew or should have known that their computer systems would be targeted by cybercriminals.

45.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

46.    According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return.  Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data." [22]  This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get

---

[21] https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last accessed March 3, 2023).
[22] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last accessed March 3, 2023).

any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[23]

47.     Despite the prevalence of public announcements of data breach and data security compromises, and despite their own acknowledgment of their duties (and professed capabilities) to keep SPI private and secure, Defendants failed to take appropriate steps to protect the SPI of Plaintiff and the proposed Class from being compromised.

**E.     At All Relevant Times Defendants Had a Duty to Properly Secure SPI**

48.     At all relevant times, Defendants had a duty to Plaintiff and Class Members to properly secure their SPI, encrypt and maintain such information using industry standard methods, train their employees, utilize available technology to defend their systems from invasion, act reasonably to prevent foreseeable harm to Plaintiff and Class Members, and to promptly notify Plaintiff and Class Members when Defendants became aware that their SPI was compromised.

49.     Defendants had the resources necessary to prevent the Data Breach but neglected to adequately invest in security measures, despite their obligation to protect such information.  Accordingly, Defendants breached their common law, statutory, and other duties owed to Plaintiff and Class Members.

50.     Security standards commonly accepted among businesses that store SPI accessible to the internet include, without limitation:

        a.      Maintaining a secure firewall configuration;

---

[23] *Id.*

b.    Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

c.    Monitoring for suspicious or irregular traffic to servers;

d.    Monitoring for suspicious credentials used to access servers;

e.    Monitoring for suspicious or irregular activity by known users;

f.    Monitoring for suspicious or unknown users;

g.    Monitoring for suspicious or irregular server requests;

h.    Monitoring for server requests for SPI;

i.    Monitoring for server requests from VPNs; and

j.    Monitoring for server requests from Tor exit nodes.

51.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[24] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[25]

52.    The ramifications of Defendants' failure to keep consumers' SPI secure are long lasting and severe.  Once SPI is stolen, particularly Social Security numbers,

---

[24] 17 C.F.R. § 248.201 (2013).
[25] *Id.*

fraudulent use of that information and damage to victims including Plaintiff and the Class may continue for years.

**F.    Sensitive Personal Information Is Highly Valuable**

53.    The SPI of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web.  Numerous sources cite dark web pricing for stolen identity credentials.  For example, personal information can be sold at a price ranging from $40 to $200.[26]

54.    Criminals can also purchase access to entire company's data breaches from $900 to $4,500.[27]

55.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.  The Social Security Administration stresses that the loss of an individual's Social Security number can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you.  Identity thieves can use your number and your good credit to apply for more credit in your name.  Then, they use the credit cards and don't pay the bills, it damages your credit.  You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment

---

[26]  *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at:* https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed March 3, 2023).
[27] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/(last accessed March 3, 2023).

for items you never bought.  Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[28]

56.    Attempting to change or cancel a stolen Social Security number is difficult if not nearly impossible.  An individual cannot obtain a new Social Security number without evidence of actual misuse.  In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

57.    Even a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[29]

58.    This data, as one would expect, demands a much higher price on the black market.  Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[30]

59.    SPI can be used to distinguish, identify, or trace an individual's identity, such as their name and Social Security number.  This can be accomplished alone, or in

---

[28] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed March 3, 2023).

[29]   Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last accessed March 3, 2023).

[30]   Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed March 3, 2023).

combination with other personal or identifying information that is connected or linked to an individual, such as their birthdate, birthplace, and mother's maiden name.[31]

60.    Given the nature of this Data Breach, it is foreseeable that the compromised SPI can be used by hackers and cybercriminals in a variety of devastating ways.  Indeed, the cybercriminals who possess Class Members' SPI can easily obtain Class Members' tax returns or open fraudulent credit card accounts in Class Members' names.

61.    Much of the SPI compromised in this Data Breach is static and difficult, if not impossible, to change (such as Social Security numbers).

62.    Moreover, Defendants have offered little to no remedial measures to Plaintiff or Class Members to protect their SPI and credit going forward.  PBI puts the onus on Class Members to seek out credit reports, or place fraud alerts or credit freezes;[32] PSC tells its customers that it is "important that **you** take immediate action."[33]  Instead, Defendants have left it entirely to their clients to offer any assistance to Plaintiff or the Class Members. CalPERS, for example, has taken the initiative of offering time-limited credit monitoring services through Experian.[34]  Even this time-limited monitoring is inadequate, however, given that Defendants' victims are likely to face many years of identity theft.

---

[31] *See* OFFICE OF MGMT. & BUDGET, OMB MEMORANDUM M-07-16 n. 1 (last accessed March 3, 2023).
[32] *See https://www.pbinfo.com/faq-consumer/* (last accessed July 10, 2023) at "What can I do to protect my personal information?"
[33] https://community.progress.com/s/article/MOVEit-Transfer-Critical-Vulnerability-31May2023 (last accessed July 10, 2023) (emphasis added).
[34] https://www.calpers.ca.gov/page/home/pbi

63.     Defendants' "remedial" advice to Plaintiff and Class Members squarely places the burden on Plaintiff and Class Members, rather than on Defendants, to monitor and report suspicious activities to law enforcement.  In other words, Defendants and their Customers expect Plaintiff and Class Members to protect themselves from Defendants' tortious acts resulting in the Data Breach. Rather than automatically enrolling Plaintiff and Class Members in credit monitoring services upon discovery of the breach, Defendants merely sent instructions to Plaintiff and Class Members about actions they can affirmatively take to protect themselves.

64.     These extremely limited remedial measures—or advice for Plaintiff to themselves take remedial measure—are wholly inadequate as they fail to provide for the fact that victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft and financial fraud, and they entirely fail to provide any compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' SPI.

65.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the victims of its Data Breach.

**G.     Defendants Failed to Comply with FTC Guidelines**

66.     Federal and State governments have established security standards and issued recommendations to mitigate the risk of data breaches and the resulting harm to consumers and financial institutions.  The Federal Trade Commission ("FTC") has issued numerous guides for business highlighting the importance of reasonable data security

practices. According to the FTC, the need for data security should be factored into all business decision-making.[35]

67.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[36] The guidelines note businesses should protect the personal consumer and consumer information that they keep, as well as properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems.

68.    The FTC emphasizes that early notification to data breach victims reduces injuries: "If you quickly notify people that their personal information has been compromised, they can take steps to reduce the chance that their information will be misused" and "thieves who have stolen names and Social Security numbers can use that information not only to sign up for new accounts in the victim's name, but also to commit tax identity theft. People who are notified early can take steps to limit the damage."[37]

---

[35] Federal Trade Commission, *Start With Security, available at*:
https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf
(last accessed March 3, 2023).
[36] Federal Trade Commission, *Protecting Personal Information: A Guide for Business, available at*: https://www.ftc.gov/tips-advice/business-center/guidance/protecting-personal-information-guide-business  (last accessed March 3, 2023).
[37] https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business
(last accessed March 3, 2023).

69.    The FTC recommends that companies verify that third-party service providers have implemented reasonable security measures.[38]

70.    The FTC recommends that businesses:

a.    Identify all connections to the computers where you store sensitive information.

b.    Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c.    Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d.    Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.    Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hack attacks.

---

[38] *See* FTC, *Start With Security*, *supra*.

f.  Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g.  Determine whether a border firewall should be installed where the business's network connects to the internet.  A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored.  Set access controls—settings that determine which devices and traffic get through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h.  Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i.  Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user.  If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

71.  The FTC has brought enforcement actions against businesses for failing to protect consumer and consumer data adequately and reasonably, treating the failure to

employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.  Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

72.    Because Class Members entrusted Defendants with their SPI, Defendants had, and have, a duty to the Plaintiff and Class Members to keep their SPI secure.

73.    Plaintiff and the other Class Members reasonably expected that when they provided SPI to Defendants' clients, Defendants would safeguard their SPI.

74.    Defendants were at all times fully aware of their obligation to protect the personal and financial data of consumers, including Plaintiff and members of the Class. Defendants were also aware of the significant repercussions if they failed to do so.

75.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—including Plaintiff's and Class Members' first names, last names, addresses, and Social Security numbers, and other highly sensitive and confidential information—constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

**H.    Plaintiff and Class Members Have Suffered Concrete Injury as a Result of Defendants' Inadequate Security.**

76.    Plaintiff and Class Members reasonably expected that Defendants would provide adequate security protections for their SPI, and Class Members provided to

Defendants, directly or indirectly, sensitive personal information, including Plaintiff's and Class Members' names, addresses, and Social Security numbers, and other SPI.

77.    Cybercriminals intentionally attack and exfiltrate SPI in order to exploit it. Thus, Plaintiff and Class Members are now, and for the rest of their lives will be, at a heightened and substantial risk of identity theft.  Plaintiff has also incurred (and will continue to incur) damages in the form of, inter alia, loss of privacy and costs of monitoring her accounts.

78.    The cybercriminals who obtained the Plaintiff's and Class Members' SPI may exploit the information they obtained by selling the data in so-called "dark markets" or on the "dark web."  Having obtained these names, addresses, Social Security numbers, and other SPI, cybercriminals can pair the data with other available information to commit a broad range of fraud in a Class Member's name, including but not limited to:

- obtaining employment;

- obtaining a loan;

- applying for credit cards or spending money;

- filing false tax returns;

- stealing Social Security and other government benefits; and

- applying for a driver's license, birth certificate, or other public document.

79.    In addition, if a Class Member's Social Security number is used to create false identification for someone who commits a crime, the Class Member may become

entangled in the criminal justice system, impairing the person's ability to gain employment or obtain a loan.

80.     As a direct and/or proximate result of Defendants' wrongful actions and/or inaction and the resulting Data Breach, Plaintiff and other Class Members have been deprived of the value of their SPI, for which there is a well-established national and international market.

81.     Furthermore, SPI has a long shelf-life because it contains different forms of personal information, it can be used in more ways than one, and it typically takes time for fraudulent misuse of this information to be detected.

82.     Accordingly, Defendants' wrongful actions and/or inaction and the resulting Data Breach have also placed Plaintiff and the other Class Members at an imminent, immediate, and continuing increased risk of identity theft and identity fraud.  Indeed, "[t]he level of risk is growing for anyone whose information is stolen in a data breach." Javelin Strategy & Research, a leading provider of quantitative and qualitative research, notes that "[t]he theft of SSNs places consumers at a substantial risk of fraud."[39]  Moreover, there is a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that have not yet been exploited by cybercriminals bears a high risk that the cybercriminals who now possess Class Members' SPI will do so at a later date or re-sell it.

---

[39] The Consumer Data Insecurity Report: Examining The Data Breach- Identity Fraud Paradigm In Four Major Metropolitan Areas, (*available at* https://www.it.northwestern.edu/bin/docs/TheConsumerDataInsecurityReport_byNCL.pdf) (last accessed March 3, 2023).

83.     As a result of the Data Breach, Plaintiff and Class Members have already suffered injuries, and each are at risk of a substantial and imminent risk of future identity theft.

## I.     Data Breaches Put Consumers at an Increased Risk of Fraud and Identity Theft.

84.     Data Breaches such as the one experienced by Plaintiff and Class Members are especially problematic because of the disruption they cause to the overall daily lives of victims affected by the attack.

85.     In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[40]  Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options.   It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiff and Class Members) must take after a breach like Defendant's are both time consuming and of only limited and short-term effectiveness.

86.     The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record," discussing the same in a 2007 report as well ("2007 GAO Report").[41]

---

[40] https://www.gao.gov/assets/gao-19-230.pdf (last accessed March 3, 2023).

[41] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf  (last accessed March 3, 2023) ("2007 GAO Report").

87.    The FTC, like the GAO recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[42]

88.    Theft of Private Information is also gravely serious.  SPI is a valuable property right.[43]

89.    It must also be noted there may be a substantial time lag — measured in years — between when harm occurs versus when it is discovered, and also between when SPI and/or financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which has conducted studies regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* 2007 GAO Report, at p. 29.

---

[42] *See* https://www.identitytheft.gov/Steps (last accessed March 3, 2023).
[43] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("SPI") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("SPI, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

90.     Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

91.     There is a strong probability that the entirety of the stolen information has been or will be dumped on the black market, meaning every Class Member, including Plaintiff, is at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

**J.     Plaintiff's Experience**

92.     Plaintiff Kelly Harris is a California resident who both pays into and collects from California's public employee pension and health benefit system, CalPERS.  Plaintiff Harris currently collects from her former husband's CalPERS account, which was transferred to her name. Plaintiff Harris also currently pays into her CalPERS account through her employment as an instructional assistant in the Poway Unified School System. In order to pay into and receive benefits from CalPERS, Plaintiff Harris was required to provide CalPERS with her sensitive personal information.

93.     CalPERS used Defendant PBI's services to determine member benefit eligibility and provided PBI with individuals' SPI—including Plaintiff Harris's SPI—to do so.  PBI used MOVEit technology to handle individuals' SPI, including Plaintiff Harris's SPI.  Plaintiff Harris reasonably expected that her highly personal information would remain safeguarded and would not be accessible by unauthorized parties.

94.     However, on or about June 22, 2023, Plaintiff Harris received a letter informing her of the Data Breach, that her information was at risk, and that she faced a substantial and significant risk of her SPI being misused. The notice letter informed her that the sensitive information impacted in the Data Breach included her full name, date of birth, and social security number.

95.     Defendants have not provided Plaintiff Harris with any remedial measures. While CalPERS has taken its own initiative to offer credit monitoring, this offer is time-limited and will expire long before the threat to Plaintiff Harris's SPI is exhausted. Furthermore, when Plaintiff Harris attempted to follow the instructions to sign up for the credit monitoring, the system was down and Plaintiff Harris was forced to wait several days—with her SPI unprotected—before she was able to sign up for credit monitoring, through no fault of her own.

96.     Subsequent to and as a direct and proximate result of the Data Breach, Plaintiff Harris has experienced nefarious uses of her SPI. Through careful monitoring of her accounts, Plaintiff Harris became aware of unusual and suspicious notification emails from two of her email accounts that have been arriving since she received the notice letter informing her of the Data Breach.

97.     Plaintiff Harris is very careful about sharing and protecting her SPI. Plaintiff Harris has never knowingly transmitted unencrypted SPI over the internet or any other unsecured channel. Plaintiff Harris has diligently reviewed her banking and credit accounts and statements since receiving notice of the Data Breach and anticipates needing to spend time on an ongoing basis to mitigate and address any future harms resulting from the

exfiltration and exploitation of her SPI.  As a single mother, Plaintiff Harris can ill afford to have her data or banking accounts misused, and maintaining good credit is especially important due to impending child-related expenses.

98.    Plaintiff Harris suffered actual injury from having her sensitive information exposed and/or stolen as a result of the Data Breach, including: (a) required mitigation efforts, including needing to monitor banking and other accounts to ensure her information is not being used for identity theft and fraud; (b) damages to and diminution of the value of the SPI, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; (c) loss of privacy; (d) continuous imminent and impending injury arising from the increased risk of financial, medical, and identity fraud and theft; and (e) time and expense of mitigation efforts required as a result of the Data Breach.

99.    In addition, knowing that hackers accessed and exfiltrated her SPI and that this likely has been and will be used in the future for identity theft, fraud, and related purposes has caused Plaintiff Harris to experience significant frustration, anxiety, worry, stress, and fear.  As both a payor into and recipient of benefits from CalPERS, Plaintiff Harris is especially concerned and interested on a continuing basis in her SPI remaining protected and safeguarded.

100.    Despite Defendants' failure to reasonably protect Plaintiff's and the Class's SPI, Defendants have not offered any compensation or adequate remedy, especially considering the significant and long-term risk Plaintiff and the Class Members face.

## CLASS ALLEGATIONS

101.    Plaintiff brings this action on behalf of themselves and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seek certification of the following Nationwide Class:

All individuals whose SPI was compromised due to the Data Breach.

102.    Excluded from the class are Defendants and their subsidiaries and affiliates; all employees of Defendants; all persons who make a timely election to be excluded from the class; government entities; and the judge to whom this case is assigned and his/her immediate family and court staff.

103.    Plaintiff reserves the right to, after conducting discovery, modify, expand, or amend the above Class definition or to seek certification of a class or subclasses defined differently than above before any court determines whether certification is appropriate.

104.    **Numerosity**. Consistent with Fed. R. Civ. P. 23(a)(1), the members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable.  Plaintiff is informed and alleges that there are millions of members of the Class.  The reportedly impacted individuals already number in the millions, and Plaintiffs believe additional entities and persons may have been affected by the Data Breach.  The precise number of class members, however, is unknown to Plaintiff. Class members may be identified through objective means. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

105.    **Commonality and Predominance**. Consistent with Fed. R. Civ. P. 23(a)(2) and with 23(b)(3)'s commonality and predominance requirements, this action involves common questions of law and fact which predominate over any questions affecting individual Class members.  These common questions include, without limitation:

a.  Whether Defendants knew or should have known that their data environment and cybersecurity measures created a risk of a data breach;

b.  Whether Defendants controlled and took responsibility for protecting Plaintiffs' and the Class's data when they stored that data on their servers;

c.  Whether Defendants' security measures were reasonable in light of the recommendations of the Department of Human Health and Services, the FTC data security recommendations, state laws and guidelines, and common recommendations made by data security experts;

d.  Whether Defendants owed Plaintiff and the Class a duty to implement reasonable security measures;

e.  Whether Defendants' failure to adequately secure Plaintiffs' and the Class's data constitutes a breach of its duty to institute reasonable security measures;

f.  Whether Defendants' failure to implement reasonable data security measures allowed the breach of their data systems to occur and caused the theft of Plaintiffs' and the Class's data;

g.  Whether reasonable security measures known and recommended by the data security community could have prevented the breach;

h. Whether Plaintiff and the Class were injured and suffered damages or other losses because of Defendants' failure to reasonably protect their data systems; and

i. Whether Plaintiff and the Class are entitled to relief.

106. **Typicality**. Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a typical member of the Class. Plaintiff and the Class are each persons whose SPI was breached by an unauthorized third party during the Data Breach. Plaintiff's injuries are similar to other class members and Plaintiff seeks relief consistent with the relief due to the Class.

107. **Adequacy**. Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendants to obtain relief for herself and for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff has also retained counsel competent and experienced in complex class action litigation of this type, having previously litigated data breach cases. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

108. **Superiority**. Consistent with Fed. R. Civ. P 23(b)(3), class action litigation is superior to any other available means for the fair and efficient adjudication of this controversy. Individual litigation by each Class member would strain the court system because of the numerous members of the Class. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of

scale, and comprehensive supervision by a single court.  A class action would also permit financial institutions to recover even if their damages are small as compared to the burden and expense of litigation, a quintessential purpose of the class action mechanism.

109.    **Injunctive and Declaratory Relief**. Consistent with Fed. R. Civ. P. 23(b)(2), Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the class as a whole.

## CLAIMS

## COUNT I
### Negligence

110.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

111.    Defendants owed a duty to Plaintiff and the members of the Class to take reasonable care in managing and protecting the highly sensitive data they managed and stored on behalf of their clients. This duty arises from multiple sources.

112.    Defendants owed a common law duty to Plaintiff and the Class to implement reasonable data security measures because it was foreseeable that hackers would target Defendants' data systems, software, and servers containing Plaintiff's and the Class's sensitive data and that, should a breach occur, Plaintiff and the Class would be harmed. Defendants alone controlled their technology, infrastructure, and cybersecurity.  They further knew or should have known that if hackers breached their data systems, they would extract sensitive data and inflict injury upon Plaintiffs and the Class.  Furthermore,

Defendants knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen.  Therefore, the Data Breach, and the harm it caused Plaintiff and the Class, was the foreseeable consequence of Defendants' unsecured, unreasonable data security measures.

113.    Additionally, Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, required Defendants to take reasonable measures to protect Plaintiffs' and the Class's sensitive data and is a further source of Defendants' duty to Plaintiffs and the Class. Section 5 prohibits unfair practices in or affecting commerce, including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to use reasonable measures to protect highly sensitive data. Defendants, therefore, were required and obligated to take reasonable measures to protect data it possessed, held, or otherwise used. The FTC publications and data security breach orders described herein further form the basis of Defendants' duties to adequately protect sensitive information. By failing to implement reasonable data security measures, Defendants acted in violation of § 5 of the FTCA.

114.    Defendants are obligated to perform their business operations in accordance with industry standards. Industry standards are another source of duty and obligations requiring Defendants to exercise reasonable care with respect to Plaintiff and the Class by implementing reasonable data security measures that do not create a foreseeable risk of harm to Plaintiff and the Class.

115.    Defendants breached their duty to Plaintiff and the Class by implementing unreasonable data security measures and by failing to keep data security "top-of-mind" despite understanding and writing about the risk of data breaches involving highly sensitive data and touting their own security capabilities.

116.    Defendants were fully capable of preventing the Data Breach. Defendants, as sophisticated and experienced technology companies, knew of data security measures required or recommended by the FTC, state laws and guidelines, and other data security experts which, if implemented, would have prevented the Data Breach from occurring at all, or limited the scope and depth of the Data Breach. Defendants thus failed to take reasonable measures to secure their systems, creating vulnerability to a breach.

117.    As a direct and proximate result of Defendants' negligence, Plaintiff and the Class have suffered and will continue to suffer injury, including the ongoing risk that their data will be used nefariously against them or for fraudulent purposes.

## COUNT II
## Negligence *Per Se*

118.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

119.    Defendants' unreasonable data security measures and failure to timely notify Plaintiff and the Class of the Data Breach violates Section 5 of the FTC Act.  Although the FTC Act does not create a private right of action, both require businesses to institute reasonable data security measures and breach notification procedures, which Defendants failed to do.

120.    Section 5 of the FTCA, 15 U.S.C. §45, prohibits "unfair. . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Defendants of failing to use reasonable measures to protect sensitive data.  The FTC publications and orders described above also form the basis of Defendants' duty.

121.    Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect sensitive data and by not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the highly sensitive nature and amount of data it stored on its services and the foreseeable consequences of a Data Breach should Defendants fail to secure their systems.

122.    Defendants' violation of Section 5 of the FTC Act constitutes negligence per se.

123.    Plaintiff and the Class are within the class of persons Section 5 of the FTCA and similar state statutes were intended to protect.  Additionally, the harm that has occurred is the type of harm the FTC Act and similar state statutes were intended to guard against. The FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same type of harm suffered by Plaintiffs and the Class.

124.    As a direct and proximate result of Defendants' negligence per se, Plaintiffs and the Class have suffered and continue to suffer injury.

## COUNT III

### Declaratory and Injunctive Relief

125.    Plaintiff repeats and re-alleges the foregoing allegations as if fully set forth herein.

126.    Under the Declaratory Judgment Act, 28 U.S.C. §§2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.  Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious and which violate the terms of the federal and state statutes described above.

127.    An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendants' common law and other duties to act reasonably with respect to safeguarding the data of Plaintiff and the Class.  Plaintiff alleges Defendants' actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate and unreasonable.  Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of additional fraud against them or on their accounts.

128.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

        a.    Defendants owed and continue to owe a legal duty to secure the sensitive information with which they are entrusted, and to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

b.      Defendants breached, and continue to breach, their legal duty by failing to employ reasonable measures to secure its customers' personal and financial information; and

c.      Defendants' breach of their legal duty continues to cause harm to Plaintiffs and the Class.

129.    The Court should also issue corresponding injunctive relief requiring Defendants to employ adequate security protocols consistent with industry standards to protect their clients' (*i.e.*, Plaintiffs' and the Class's) data.

130.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendants' data systems. If another breach of Defendants' data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

131.    The hardship to Plaintiff and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued.

132.    Issuance of the requested injunction will not disserve the public interest.  To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

## PRAYER FOR RELIEF

133.    Wherefore, Plaintiff, on behalf of herself and the Class, request that this Court award relief as follows:

a.    An order certifying the class and designating Plaintiff as the Class Representative and her counsel as Class Counsel;

b.    An award to Plaintiff and the proposed Class members of damages with pre-judgment and post-judgment interest;

c.    A declaratory judgment in favor of Plaintiff and the Class;

d.    Injunctive relief to Plaintiff and the Class;

e.    An award of attorneys' fees and costs as allowed by law; and

f.    An award such other and further relief as the Court may deem necessary or appropriate.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial for all claims so triable.

Respectfully submitted,

Dated: July 11, 2023

/s/ *Brian C. Gudmundson*
Brian C. Gudmundson (MN Lic. #336695)
Charles R. Toomajian (MN Lic. #397879)
Michael J. Laird (MN Lic. #398436)
Rachel K. Tack (MN Lic. #399529)
**ZIMMERMAN REED LLP**
1100 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
brian.gudmundson@zimmreed.com
charles.toomajian@zimmreed.com
michael.laird@zimmreed.com
rachel.tack@zimmreed.com

Gary F. Lynch
Nicholas A. Colella
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
gary@lcllp.com
nickc@lcllp.com

Jennifer Czeisler
**JKC LAW, LLC**
269 Altessa Blvd.
Melville, NY 11747
Telephone: (516) 457-9571
jennifer@jkclawllc.com

James M. Evangelista
**EVANGELISTA WORLEY LLC**
500 Sugar Mill Road Suite 245A
Atlanta, GA 30350
Telephone: (404) 205-8400
jim@ewlawllc.com